Argued and submitted April 16, affirmed November 25, 1998

EUGENE POLICE EMPLOYEES' ASSOCIATION,
*Respondent,*

*v.*

CITY OF EUGENE,
*Petitioner.*

(UP-5-97; CA A99251)

972 P2d 1191

William F. Gary argued the cause for petitioner. With him on the brief were Sharon A. Rudnick, Christine Nesbit and Harrang Long Gary Rudnick.

John E. Hoag argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Wollheim, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

The City of Eugene (the city) seeks review of an order of the Employment Relations Board (ERB) that concluded that the city had committed an unfair labor practice by refusing to bargain with the Eugene Police Employees' Association (association) over a provision that the association had proposed be added to the parties' collective bargaining agreement. *See* ORS 243.672(1). We review for errors of law, ORS 183.482(8)(a), and affirm.

The association represents the employees of the city's police department. The association and the city are parties to a collective bargaining agreement that is effective through June 30, 1999.[1] In February 1996, the parties reopened negotiations on the agreement in order to clarify certain aspects of it. While bargaining, the association proposed to add the following provision to Article 21 of the agreement:

"(d.)  If an employee faces criminal charges arising out of the course and scope of his employment and the employee is acquitted on those charges, the employer shall reimburse the employee for all reasonable expenses connected with the defense of that case. The term 'faces criminal charges' includes preparing and responding to an investigation where a law enforcement agency, including a District Attorney's office, is investigating whether the employee's conduct is criminal. This section will apply even if charges are not brought, but it shall not apply if the employee is terminated for such conduct and the termination is ultimately upheld through the grievance arbitration process."

The city refused to bargain over that provision, arguing that it embodied a prohibited subject of bargaining because its enforcement would violate public policy. In the alternative, the city argued that, at most, the provision embodied a permissive subject of bargaining. If the city were correct on the latter point, it did not have to bargain over the provision, because public employers are not required under the Public

[1] The collective bargaining agreement was initially effective from July 1, 1994, to June 30, 1996, but it was extended by a memorandum of understanding through June 30, 1999.

Employees Collective Bargaining Act (PECBA) to bargain over provisions that involve permissive subjects of bargaining. In September 1996, the parties declared the labor negotiations at an impasse.

In January 1997, the association filed an unfair labor practice complaint with ERB, alleging that the city had violated ORS 243.672(1)(e) when it refused to bargain over the proposed provision. ERB agreed. It concluded that enforcement of the provision would not violate public policy, so the provision was not a prohibited subject of bargaining. Moreover, it concluded that, under ORS 243.672, the provision embodied a mandatory rather than a permissive subject of bargaining. ERB concluded, therefore, that the city had committed an unfair labor practice when it refused to bargain over the provision. The city filed a petition for reconsideration with ERB, which ERB denied, and it now seeks judicial review of ERB's order.

■ On review, the city first assigns error to ERB's conclusion that the proposed provision is not a prohibited subject of bargaining. It argues that the provision embodies a prohibited subject of bargaining for two reasons, which we will address in turn. First, it argues that, in some circumstances, the provision would require the city to reimburse employees for criminal defense costs in violation of the public policy identified in *Isenhart v. General Cas. Co. of America*, 233 Or 49, 53, 377 P2d 26 (1962), that prohibits the enforcement of agreements that indemnify people against the consequences of their intentional misconduct. We disagree.

■ The consequences against which people are barred from obtaining indemnity are the consequences that result from being *found* liable for intentional misconduct. They do not include the cost of defending against the imposition of that liability. In other words, the public policy expressed in *Isenhart* prohibits an insurer from *indemnifying* an insured for the insured's intentional injury of another, but it does not prohibit an insurer from *defending* an insured against such a claim if, as a legal matter, the insured is entitled to a defense. *See, e.g., Ferguson v. Birmingham Fire Ins.*, 254 Or 496, 505-06, 460 P2d 342 (1969).

The reason for that distinction is directly tied to the purpose of the public policy, which is to prevent a person who intentionally injures another from avoiding the punishment that flows from that conduct. *Isenhart*, 233 Or at 53. As the court said in *Isenhart*:

> "*A person should suffer the financial consequences flowing from his intentional conduct and should not be reimbursed for his loss, even though he bargains for it in the form of a contract of insurance.* A similar idea is expressed in the cases which exclude coverage on the ground that 'a person should not profit from his own wrong.'"

*Id.* (footnote omitted; emphasis added). Providing a defense to a person who may, or may not, be liable for intentionally injuring another does not permit the person to avoid the punishment that flows from his or her actions. Indeed, the cost of providing a defense against a meritless claim is often as great as that involved in defending against a legitimate one. That cost is not an aspect of the punishment imposed for the misconduct but, simply, an aspect of our legal system. Because the purpose of the public policy is not advanced by precluding an insurance company from defending a person accused of intentionally injuring another, it makes sense that the public policy expressed in *Isenhart* applies, as it does, only to the duty to indemnify and not to the duty to defend.

With that understanding of the relevant public policy, we turn to the provision proposed here. The principle that the provision embodies is analogous to a duty to defend. The provision would require the city to reimburse covered employees who incur expenses during the course of a criminal investigation of their actions when they are neither convicted nor fired for those actions. It would not indemnify employees against the punishment that flows from their intentional acts. Rather, it would cover only the cost of defending against the imposition of that punishment. Accordingly, we conclude that the public policy expressed in *Isenhart* does not prohibit the enforcement of the proposed provision, and it is not a basis on which to conclude that the provision is a prohibited subject of bargaining.

In the alternative, the city argues that the proposed provision is a prohibited subject of bargaining because, on

occasion, an employee might engage in conduct that constitutes malfeasance in office or willful or wanton neglect of duty for which the employee is criminally investigated but is neither fired nor convicted of a crime. Under the proposed contract provision, the city would be required to reimburse the employee for the defense expenses reasonably incurred in the investigation. The city argues that that reimbursement would violate a public policy embodied in ORS 30.285 and ORS 30.287 of the Oregon Torts Claims Act (OTCA) that prohibits the use of public funds to defend public employees against liability for conduct that constitutes either malfeasance in office or willful or wanton neglect of duty. We conclude that those statutes do not create such a broad public policy.

The legislature enacted the OTCA in 1968 as a partial waiver of sovereign immunity to "give an aggrieved citizen a remedy against a governmental body which was not theretofore available to him." *Yunker v. Mathews*, 32 Or App 551, 558, 574 P2d 696 (1978) (Thornton, J., specially concurring). In 1975, the legislature amended ORS 30.285 and ORS 30.287 of the OTCA "to require that public bodies defend and indemnify their employees against all tort claims arising out of the performance of their duties, except for claims involving 'malfeasance in office or willful or wanton neglect of duty.' " *Stevenson v. State of Oregon*, 290 Or 3, 12, 619 P2d 247 (1980). ORS 30.285 provides, in part:

"(1) The governing body of any public body shall defend, save harmless and indemnify any of its officers, employees and agents, whether elective or appointive, against any tort claim or demand, whether groundless or otherwise, arising out of an alleged act or omission occurring in the performance of duty.

"(2) The provisions of subsection (1) of this section do not apply in case of malfeasance in office or willful or wanton neglect of duty."

ORS 30.287 provides, in part:

"(1) If any *civil action, suit or proceeding* is brought against any officer, employee or agent of a local public body other than the state which on its face falls within the provisions of ORS 30.285(1), or which the officer, employee or

agent asserts to be based in fact upon an alleged act or omission in the performance of duty, the officer, employee or agent may file a written request for counsel with the governing body of the public body. *The governing body shall thereupon engage counsel to appear and defend the officer, employee or agent unless after investigation it is determined* that the claim or demand does not arise out of an alleged act or omission occurring in the performance of duty, or *that the act or omission complained of amounted to malfeasance in office or willful or wanton neglect of duty, in which case the governing body shall reject defense of the claim.*

"* * * * *

"(3)   If the governing body rejects defense of a claim under subsection (1) of this section, *no public funds shall be paid in settlement of the claim or in payment of any judgment against such officer, employee or agent.* Such action by the governing body shall not prejudice the right of the officer, employee or agent to assert and establish in an appropriate proceeding that the claim or demand in fact arose out of an alleged act or omission occurring in the performance of duty, or that the act or omission complained of did not amount to malfeasance in office or willful or wanton neglect of duty, in which case the officer, employee or agent shall be indemnified by the public body against liability and reasonable costs of defending the claim."

(Emphasis added.) The city argues that, based on those statutes, "it is clearly the public policy of the state that public funds will not be used to indemnify a public employee for defense costs arising out of willful or wanton misconduct," regardless of the context in which those defense costs arise. We disagree.

The statutes from which the city derives its broad public policy are part of the OTCA. By its terms, the OTCA establishes when the state and its subdivisions must expend public funds to address *tort* claims. Through the amendment of ORS 30.285 and ORS 30.287 in 1975, the legislature expanded the OTCA to require the state and its subdivisions to take financial responsibility for tort claims filed against their employees.

Indeed, the Supreme Court has explicitly held that ORS 30.287 is directed to "torts, [and] not to other claims."

*City of Tualatin v. City-County Ins. Services Trust,* 321 Or 164, 171, 894 P2d 1158 (1995) (holding that ORS 30.287 does not oblige a municipality to defend an employee against an ethics charge). That statute and ORS 30.285 were designed "to eliminate the ground for concern by public employees that they can be held liable for a good faith failure to use reasonable care." *Stevenson,* 290 Or at 12. We have held that, "[i]n so doing, the indemnity statutes embody and effectuate two fundamental public policies. First, they encourage qualified persons to accept public employment. Second, they encourage the zealous execution of public functions, duties, and responsibilities." *Welker v. TSPC,* 152 Or App 190, 198, 953 P2d 403 (1998).

■      In light of the explicit focus of the OTCA on the liability of the state and its subdivisions for tort claims, and the specific design and purpose of ORS 30.285 and ORS 20.287, we conclude that any public policy created by those two statutes applies only to tort claims. Thus, although ORS 30.285 and ORS 30.287 restrict the use of public funds under certain circumstances, that restriction applies only to tort claims. The statutes do not establish a policy that restricts the state and its subdivisions from expending public funds in any manner that they deem fit outside that context. Therefore, we conclude that the OTCA does not prevent the enforcement of the provision at issue. Accordingly, we conclude that the provision does not embody a prohibited subject of bargaining.

■      In its second assignment of error, the city argues that ERB erred when it concluded that the proposed provision was a mandatory subject of bargaining. Under PECBA, only "employment relations" are mandatory subjects of bargaining. ORS 243.650(4). "Employment relations" are defined in ORS 243.650(7). Until 1995, ORS 243.650(7) provided:

> " 'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures and other conditions of employment."

*Former* ORS 243.650(7), *renumbered by* Or Laws 1995, ch 286, § 1.[2] In 1995, the legislature added the following subsections to that definition:

---

[2] When the legislature amended ORS 243.650(7) in 1995, it renumbered *former* ORS 243.650(7) as ORS 243.650(7)(a). Or Laws 1995, ch 286, § 1. For clarity and

"(b)  'Employment relations' *does not include* subjects determined to be permissive, nonmandatory subjects of bargaining by the Employment Relations Board prior to June 6, 1995.

"(c)  After June 6, 1995, *'employment relations' shall not include subjects which the Employment Relations Board determines to have a greater impact on management's prerogative than on employee wages, hours, or other terms and conditions of employment.*

"(d)  'Employment relations' *shall not include* subjects that have an insubstantial or de minimis effect on public employee wages, hours, and other terms and conditions of employment.

"(e)  For school district bargaining, 'employment relations' *shall expressly exclude* class size, the school or educational calendar, standards of performance or criteria for evaluation of teachers, the school curriculum, reasonable dress, grooming and at-work personal conduct require-·ments respecting smoking, gum chewing and similar matters of personal conduct, the standards and procedures for student discipline, the time between student classes, the selection, agendas and decisions of 21st Century Schools Site Councils established under ORS 329.704, and any other subject proposed that is permissive under paragraphs (b), (c) and (d) of this subsection.

"(f)  For all other employee bargaining except school districts, 'employment relations' *expressly excludes* staffing levels and safety issues (except those staffing levels and safety issues which have a direct and substantial effect on the on-the-job safety of public employees), scheduling of services provided to the public, determination of the minimum qualifications necessary for any position, criteria for evaluation or performance appraisal, assignment of duties, workload when the effect on duties is insubstantial, reasonable dress, grooming, and at-work personal conduct requirements respecting smoking, gum chewing, and similar matters of personal conduct at work, and any other subject proposed that is permissive under paragraphs (b), (c) and (d) of this subsection."

Or Laws 1995, ch 286, § 1 (emphasis added). Applying that statute in this case, ERB concluded that the provision at

consistency, we will refer to the provision contained in *former* ORS 243.650(7) and in ORS 243.650(7)(a) as ORS 243.650(7)(a) throughout the balance of this opinion.

issue was "a matter concerning * * * direct or indirect monetary benefits." Because that matter is expressly identified in ORS 243.650(7)(a) as one involving "employment relations," ERB concluded that the provision involved a mandatory subject of bargaining. Therefore, the city had committed an unfair labor practice by refusing to bargain over it.

On review, the city does not dispute ERB's conclusion that the proposed contract provision concerns "direct or indirect monetary benefits" to employees. Moreover, it agrees that, until the legislature amended ORS 243.650 in 1995, the proposed provision would have been a mandatory subject of bargaining, because matters concerning the subjects listed in subsection (7)(a) were matters that *per se* involved employment relations. It disagrees, however, with ERB's conclusion that the 1995 amendments did not change that result. Specifically, the city argues that subsection (7)(c) effectively eliminated the concept of *per se* employment relations and now, even if a proposed provision concerns one of the subjects specifically listed in subsection (7)(a), it does not involve employment relations unless ERB determines that it has a greater effect on "employee wages, hours, or other terms and conditions of employment" than on "management's prerogative."

■ In order to evaluate the city's argument, we must interpret how the legislature's addition of subsection (7)(c) affects the meaning of subsection (7)(a). We do that by examining the text of the statute in context, turning to legislative history only if we cannot determine the meaning of the statute from that review. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993).

We begin our inquiry with an examination of how the Supreme Court had interpreted subsection (7)(a) before the 1995 amendments. The Supreme Court first interpreted the provision in *Springfield Educ. Assn. v. School Dist.*, 290 Or 217, 233, 621 P2d 547 (1980). In that case, during contract negotiations between three school districts and three teachers' associations, the school districts refused to bargain over several proposed provisions on teacher evaluations. Each association filed an unfair labor practice complaint with

ERB. As an initial matter, ERB noted that the proposed provisions did not concern any of the listed subjects in subsection 7(a). ERB concluded, therefore, that in order for the provisions to involve "employment relations," they had to be matters that concerned "other conditions of employment." To determine whether the provisions were matters concerning conditions of employment, ERB applied a balancing test. If the subject of the provision had a greater effect on "employment conditions" than on "management prerogatives," then it was a condition of employment and, accordingly, the provision involved employment relations. *Id.* at 234. Applying the test to the four provisions at issue, ERB concluded that only one was a matter that involved a condition of employment.

On review, the Supreme Court endorsed ERB's interpretation of subsection (7)(a). First, the court noted that the legislature had completely defined the term "employment relations":

> "The wording of subsection (7)[(a)] indicates that the legislature chose to define 'employment relations' by example, but did not use an exhaustive list of examples. Rather, it used a general term, 'other conditions of employment,' [that was] intended to allow ERB to include other subjects of like character. The legislature expressed its policy choice by listing definitional examples. The reference to 'other' such subjects was not a delegation to ERB to make different choices; *rather, it is, in effect, a direction to ERB to replicate the same choice by regarding as 'employment relations' only those subjects which embody the same characteristics as 'monetary benefits, hours, vacations, sick leave, grievance procedures,' and no others.* The question of whether any subject is like or unlike the listed matters is one of interpretation, not of discretion. The legislature expressed its meaning fully. Thus, despite the appearance of the term in the context of a broad regulatory scheme, we conclude that the statutory terms 'employment relations' and 'conditions of employment' were intended to charge ERB with interpretative rather than legislative responsibility."

*Id.* at 233 (emphasis added).

With that understanding of the legislature's intent, the court considered ERB's balancing test. The court held

that the balancing test effectively ensured that only those subjects that "have characteristics similar to the statutory examples" listed in subsection (7)(a) would be deemed "conditions of employment." Accordingly, the court concluded that the test accurately captured the legislature's intent in defining employment relations. Reviewing ERB's application of the balancing test to the four provisions at issue, the court concluded that ERB had misapplied it in one instance. It modified ERB's order to account for that conclusion but otherwise affirmed the order. *Id.* at 240.

Implicit in the court's decision in *Springfield* was the conclusion that, because the balancing test was designed to determine whether a subject "embod[ied] the same characteristics" as the subjects specifically listed in subsection (7)(a), the balancing test did not apply to those subjects. That conclusion was made explicit in *Portland Fire Fighters Assn. v. City of Portland*, 305 Or 275, 282-83, 751 P2d 770 (1988). In that case, the Portland Fire Fighters Association had proposed a provision on vacations over which the city had refused to bargain. Although matters concerning vacations are specifically defined as employment relations in subsection (7)(a), ERB applied the balancing test outlined in *Springfield* to determine if the provision involved employment relations. The Supreme Court reversed, holding that,

> "by explicitly identifying subjects in ORS 243.650(7)[(a)], the Legislative Assembly has made 'matters concerning' those subjects matters for 'mandatory' collective bargaining, regardless of the relative effect on the interests involved. The 'balancing test' upheld in *Springfield* was meant to interpret the term 'other conditions of employment' under the Legislative Assembly's direction to the ERB 'to replicate the [Legislative Assembly's] choice by regarding as "employment relations" only those subjects [that] embody the same characteristics as "monetary benefits, hours, vacations, sick leave, grievance procedures," and no others.' 290 Or at 233. *There is no need for replication, however, where the Legislative Assembly has already determined that a specific subject is a matter for collective bargaining.*"

*Portland Fire Fighters*, 305 Or at 282-83 (emphasis added).

Under Oregon law, the Supreme Court's interpretation of subsection (7)(a) became a part of the statute itself. *See State v. King*, 316 Or 437, 445-46, 852 P2d 190 (1993). When the legislature amended ORS 243.650 in 1995, it presumably was aware of that fact. Thus, it knew that the language in subsection (7)(a) meant: (1) that matters concerning the subjects specifically listed in that provision were *per se* employment relations; (2) that matters concerning other subjects are employment relations only if the matters concern conditions of employment; (3) that conditions of employment are subjects that embody the same characteristics as the subjects listed in subsection (7)(a); and (4) that, to determine whether an unlisted subject embodies the same characteristics as a listed subject, ERB is to balance the subject's effect on employment conditions against its effect on management prerogatives. Knowing that, the legislature chose to leave subsection 7(a) intact and to add other provisions to supplement that definition.

Nevertheless, the city argues that the Supreme Court's interpretation of subsection (7)(a) can no longer be sustained in light of one of the newly enacted provisions, subsection (7)(c). As we have already noted, subsection (7)(c) provides:

> "After June 6, 1995, 'employment relations' shall not include subjects which the Employment Relations Board determines to have *a greater impact on management's prerogative than on employee wages, hours, or other terms and conditions of employment.*"

(Emphasis added.) The city argues that that provision eliminates the *per se* subjects of employment relations identified in subsection (7)(a). We disagree. The balancing test outlined in subsection (7)(c) closely resembles the balancing test outlined by the court in *Springfield*. We find it inconceivable that the legislature would choose to *keep* the original definition of employment relations in subsection 7(a) and *add* language that closely resembles the balancing test derived from that definition, in order to *eliminate* the definition in subsection 7(a) and replace it with one in which there are no *per se* employment relations.

Moreover, the city's proposed interpretation would render subsection 7(a) superfluous. The function of the balancing test established in *Springfield* and in subsection 7(c) is to determine whether a particular subject of bargaining involves employment relations, that is, whether a particular subject should be added to the list of employment relations in subsection 7(a). If every subject must go through the balancing test to determine if it involves employment relations, then the list of subjects in subsection 7(a) serves no purpose. We are to interpret statutes to give meaning to all of their provisions, if possible. ORS 174.010. The city's proposed construction of ORS 243.650 violates that principle.

The only tenable understanding of subsection (7)(c) is that it codifies the balancing test that ERB has used to determine whether a subject that is not listed in subsection 7(a) is a condition of employment. That test is designed to ensure that unlisted subjects that are determined to involve conditions of employment "embody the same characteristics as 'monetary benefits, hours, vacations, sick leave [or] grievance procedures.'" *Springfield*, 290 Or at 233. It is axiomatic that a listed subject embodies the same characteristics as the listed subjects. *See Portland Fire Fighters*, 305 Or at 281-85 (discussing why the balancing test does not apply to listed subjects). Therefore, we conclude that the balancing test outlined in subsection 7(c) does not apply to the listed subjects in subsection 7(a) and that matters concerning those subjects involve employment relations. In this case, it is undisputed that the proposed provision concerns "direct or indirect monetary benefits." Thus, it involves employment relations. As such, it is a mandatory subject of bargaining. *See* ORS 243.650(4). ERB correctly held that the city had committed an unfair labor practice when it refused to bargain over the provision.

Affirmed.