Argued and submitted January 3, reversed and remanded November 13, 2014

Wai Po LEUNG,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Employment Appeals Board
12AB1262; A151956

340 P3d 62

John D. Burgess argued the cause and filed the brief for petitioner.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Claimant seeks judicial review of a final order of the Employment Appeals Board (EAB). The EAB affirmed the administrative law judge's (ALJ) denial of claimant's late request for a hearing concerning his right to extended unemployment insurance benefits that he had already received. Claimant, who is a native Cantonese speaker, contends that the Employment Department (department) failed to follow its policy on assisting claimants with limited English language proficiency. He contends that those circumstances met the "good cause" standard for late hearing requests in OAR 471-040-0010(1). We reverse and remand.

## I. FACTS AND PROCEDURAL HISTORY

Agency findings of fact, unless challenged, are assumed to be correct on review. *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 134, 903 P2d 351 (1995). The unchallenged findings of the EAB in this case are as follows: Claimant's native language was Cantonese. Although he had lived and worked in the United States for approximately thirty years, he spoke broken English. He could "listen pretty good" in English, but reading English was a "problem." He sometimes had his wife assist him with English communications.

Claimant filed an initial claim for unemployment insurance benefits in February 2009. When payment on his claim for regular benefits was exhausted, he filed for, and was paid, extended benefits. However, the department later determined that he was not entitled to those extended benefits. In March 2011, claimant received a written decision from the department to that effect, in English.

Within the time period allowed for a hearing request, claimant took the 2011 decision to a local office of the department, where a department employee explained to him that he could request a hearing on the decision. Claimant therefore understood that he had been denied extended benefits and that he could request a hearing on the denial, but he did not comprehend the full legal effect of the decision, namely, that he would have to repay the extended

benefits that he had received. Claimant filled out a hearing request form but never filed it.

Ten months later, in 2012, claimant received a notice from the department stating that he had to repay the extended unemployment insurance benefits that he had received. Once he received the repayment notice, claimant filed a late request for a hearing on the department's March 2011 decision that he was ineligible for the extended benefits.

The administrative record reveals the following procedural history. Claimant appeared at two hearings regarding whether he had good cause for the lateness of his 2012 hearing request; the second hearing was scheduled so that claimant could have an interpreter. Claimant represented himself at both hearings. He did not introduce a copy of the department's "limited English proficient" (LEP) policies as an exhibit. A representative of the department appeared and testified, but no party presented testimony from the department's employee in its Albany office who had spoken with claimant about the March 2011 decision. The ALJ determined that claimant had not shown good cause to extend the time he had to request a hearing to challenge the department's March 2011 decision that he was ineligible for the extended benefits.

Claimant appealed the ALJ's decision to the EAB. Before the EAB, claimant focused on the terms of OAR 471-040-0010(2), specifically, whether the department had failed to follow its policies regarding claimants who are LEP by failing "to communicate orally or in writing in a language that could be understood" by him "upon gaining knowledge" that he "needed or was entitled to such assistance." The EAB affirmed, although it concluded that claimant had limited English proficiency.[1] The term "limited English proficient person" is defined, for purposes of the department's contested case proceedings, as "a person who, by reason of place of birth, national origin, or culture, speaks a language other than English and does not speak English at all or with

---

[1] We reject the department's argument on review that no evidence in the record establishes that claimant was an LEP person.

adequate ability to communicate effectively in the proceedings." OAR 471-040-0007(2)(a).

The EAB concluded that claimant had failed to demonstrate the department's violation of its policy for providing services to persons who are LEP:

> "Claimant failed to show the Department had, much less failed to follow, an LEP policy requiring its representatives to explain to claimant he would 'not be able to challenge any future attempt to collect' unless he appealed its decision, or knew claimant 'needed or was entitled' to translation, interpretive, or other LEP services it failed to provide."

The EAB found that claimant "did not assert or show he asked the Department in March 2011 'to communicate orally or in writing' in Cantonese." Rather, the EAB observed, "his testimony as to the advice he sought and was given" in the Albany office "was very vague."

The EAB also noted that many claimants, both those who are native English speakers and those who are not, do not understand that a failure to appeal a notice of ineligibility for benefits received will have an adverse legal consequence: the ineligibility determination will become final and binding and the claimant will have to repay the benefits received. The EAB then concluded that "it does not appear claimant was prevented from meeting the 20-day deadline by his failure to understand the deadline existed." Rather, the EAB concluded that, like many other claimants, claimant was operating under a misunderstanding of the legal effect of the March 2011 decision.

## II. ANALYSIS

On review, claimant and the department dispute whether claimant met his burden to establish good cause for an extension of time to request a hearing. We review the EAB's final order to determine whether it is supported by substantial evidence in the record. ORS 183.482(8)(c). We also review an agency's interpretation of law for legal error. ORS 183.482(8)(a). We accord an agency's interpretation of its own administrative rule deference; we will affirm "if the interpretation is plausible and is not inconsistent with the wording of the rule itself, with the rule's context, or with

some other source of law." *Stroeder v. OMAP*, 178 Or App 374, 380, 37 P3d 1012 (2001); *accord Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 311, 297 P3d 1256 (2013).

Under ORS 657.875, the period for a claimant to request a hearing to challenge a determination regarding unemployment insurance benefits "may be extended, upon a showing of good cause therefor." The department's rule that governs whether a claimant can show "good cause" for extension of the period for requesting a hearing provides:

"(1) 'Good cause' exists when an action, delay, or failure to act arises from an excusable mistake or from factors beyond an applicant's reasonable control.

"* * * * *

"(b) Good cause does not include:

"* * * * *

"(B) Not understanding the implications of a decision or notice when it is received.

"(2) Notwithstanding section (1) of this rule, good cause for failing to file a timely request for hearing shall exist when the appellant provides satisfactory evidence that the Employment Department failed to follow its own policies with respect to providing service to a limited English proficient person, including the failure to communicate orally or in writing in a language that could be understood by the limited English proficient person upon gaining knowledge that the person needed or was entitled to such assistance."

OAR 471-040-0010. Under the plain meaning of the text of OAR 471-040-0010(2), a claimant has the burden to prove the facts necessary to meet the requirements for the "good cause" exception based on the department's failure to follow its own LEP policies. However, the EAB explained in its decision in this case that OAR 471-040-0010(2) "does not require a causal connection between the Department's failure to follow its LEP policies and the missed filing deadline."

On review, the department acknowledges that it does have an LEP policy and has appended its applicable policy to its brief. Under a section entitled "Staff Responsibilities," the policy provides that departmental staff will be trained

and should try to determine whether a customer needs language assistance:

**"Training**

"New staff will complete an online Universal Access training within the first 30 days of their employment. Instructional information offered is to acquaint new employees to the federal LEP Policy Guidelines, ADA laws and accessing contracted language services provided to staff. Certification will be issued upon completion of the online training.

**"Customer Interaction**

"Employment Department staff should make every attempt to determine whether a customer is in need of interpretive services. Staff should contact a qualified bilingual staff member if available to assist. If qualified staff are not available, use the 'Language Line Identification Cards' to determine the language spoken. The Language Line can then be used for interpretive services."

(Boldface in original.) Under a section entitled "Management Responsibilities," the department's LEP policy in part provides:

**"Written Communication**

"All written communication mailed to LEP customers regarding agency services and programs such as Business & Employment Services, Child Care, Office of Human Resources, Tax, Workforce & Economic Research, and Unemployment Insurance—including benefits information, adjudication, or hearings decisions—will include a multi-language service insert offering language services at no cost to the LEP customer."

(Boldface in original.)

The parties' specific dispute concerns whether claimant met the proof requirements in OAR 471-040-0010(2). Claimant argues that the EAB's decision was not supported by substantial evidence. He contends that the evidence instead established that the department knew that he needed language assistance, asserting that the department (1) knew that he did not understand the decision and asked the department's office in Albany for help in understanding it and (2) knew that he was not a native or skilled English

speaker when he spoke in limited, broken English with a department employee about the March 2011 decision (as evidenced by the ALJ having rescheduled the hearing so that he could have an interpreter). Nevertheless, he asserts that, despite his LEP status and his limited English skills when he orally communicates, the department indisputably failed to determine whether he needed interpretive services and failed to communicate with him in Cantonese. Claimant argues that he left the department's office in Albany understanding that "he was not going to receive any more benefits, but for reasons which were obscure to him."[2]

The department first responds that claimant's challenge fails because he did not prove in the first place that the department had an LEP policy.[3] We reject that argument because the department's own rule concerning good cause, OAR 471-040-0010(2), indicates that the department has an LEP policy, which it acknowledges, as noted earlier.

Rather, whether claimant established good cause for his late hearing request turns on whether the department followed its LEP policies to provide language assistance "upon gaining knowledge" that he "needed or was entitled to such assistance," as provided in OAR 471-040-0010(2). That is because the only possible findings on this record are that (1) claimant is an LEP person, as the EAB determined, and (2) the department failed "to communicate orally or in writing" with claimant in his native Cantonese.

On that key issue, the parties differ regarding what "knowledge" claimant was required to prove under the department's "good cause" rule and, accordingly, whether claimant met his burden of proof given the evidence in the record. In determining the meaning of an administrative rule, we "determine the meaning of the words used,

---

[2] At his hearing before the ALJ, claimant testified that "I do not quite fully understand how the system work from the beginning to the end and I thought that because my benefit had ended, so I thought that I should not continue to file to the government and the time of the offices."

[3] Given that a claimant need not prove causation, we reject the department's argument that claimant was required to prove that the LEP policy required the kind of information in his native Cantonese language that the EAB ruled would have prompted him to decide to request a hearing, namely, an explanation of the legal consequences of the March 2011 ineligibility decision.

giving effect to the intent of the enacting body." *Abu-Adas v. Employment Dept.*, 325 Or 480, 485, 940 P2d 1219 (1997). We normally do so by considering "the text of the rule and its context, including other portions of the rule and related laws, and the rule's adoption history." *Brand Energy Services, LLC v. OR-OSHA*, 261 Or App 210, 214, 323 P3d 356 (2014). In this case, although the parties both contend that we should interpret the rule simply by considering the text of OAR 471-040-0010(2), we consider the text of the rule in context, specifically, in context with the department's LEP policy and federal law requiring the department to provide access to LEP persons.

The department contends that OAR 471-040-0010(2) should be understood to require a claimant to prove that the department knew both (1) that the claimant was a limited English language person and (2) that the claimant was "in need of interpretive services in a particular language." To prove the latter, the department asserts that claimant had to, but failed to, prove that he "expressed a language preference or asked the department to communicate with him in Chinese." In light of the rule's text and context, we decline to accept the interpretation of the knowledge requirement that the department advances.

The text of the rule itself does not support the department's interpretation. By its terms, OAR 471-040-0010(2) requires a claimant to prove that the department "failed to follow its own policies with respect to providing service to a limited English proficient person." The department's rule also provides that a sufficient showing includes proof of the department's "failure to communicate orally or in writing in a language that could be understood by the limited English proficient person upon gaining knowledge that the person needed or was entitled to such assistance." The rule does not state that a claimant must prove that the department knew that the claimant was an LEP person. Rather, under the plain meaning of the text, a claimant who is an LEP person can prove a failure to follow the LEP policy by proving that the department gained "knowledge" that the claimant "needed or was entitled to" oral or written language assistance. In other words, whether the claimant is an LEP person is separate from whether the department

gained knowledge that the claimant "needed or was entitled" to assistance. Thus, the department's proffered interpretation appears to be inconsistent with the wording of the rule itself.

As for the department's position that a claimant must prove that he or she expressed a language preference or asked the department to communicate in a particular language, we again disagree that the department posits a plausible interpretation. The department's interpretation does not comport with the text of the rule, which does not require proof of any request on the part of the claimant or customer. Instead, the rule indicates that it is department policy to provide language assistance "upon gaining knowledge" that the claimant or customer needs or is entitled to such assistance.

The ordinary meaning of the transitive verb "gain" is "to get or attain to possession" or to "cause to be obtained or given." *Webster's Third New Int'l Dictionary* 928 (unabridged ed 2002). Thus, to "gain" something, such as knowledge, suggests, at least in some usages, some activity on the part of the actor to get or attain that thing. The ordinary meaning of "knowledge" includes "the fact or condition of being cognizant, conscious, or aware of something," such as knowledge "of what she had had to endure" or the knowledge "that it was really important." *Webster's* at 1252. Although the department could "gain knowledge" of a customer's need for language assistance by way of a customer's request that the department communicate in a particular foreign language, the department's rule is not couched in such specific, limited terms and suggests instead that the department may get the knowledge or cause such knowledge to be obtained in other ways, such as by engaging in communication with the customer and observing limited English proficiency.

Context supports our analysis of the text of OAR 471-040-0010(2). The department's proffered interpretation contradicts the terms of its LEP policy, which is referenced in the rule and therefore provides context for understanding the rule. The LEP policy states that "[d]epartment staff should make every attempt to determine whether a customer is in need of interpretive services." The LEP policy

thus does not require customers to ask for an interpreter, nor does it require department employees to determine whether a customer is an LEP person. The policy simply requires the department's employees to determine whether the customer needs interpretive services.

The department's LEP policy also requires a multi-language insert "offering language services at no cost." That written-communication provision does not depend on customer or claimant request. That part of the LEP policy is further evidence that the department does not require customers or claimants to request specific language assistance in order for the department to fail to follow its LEP policy.[4]

Moreover, states have an obligation to provide meaningful access to their unemployment insurance programs for individuals with limited English proficiency. *See* Section 601 of Title VI of the Civil Rights Act of 1964, codified at 42 USC § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *Lau v. Nichols*, 414 US 563, 568-69, 94 S Ct 786, 39 LEd 2d 1 (1974) (holding that prohibited national origin discrimination under Title VI includes failing to provide LEP individuals with meaningful access to recipient programs). A "program or activity" or "program" in 42 USC section 2000d refers to "all of the operations of," among other things, "a department, agency, special purpose district, or other instrumentality of a State" or "the entity of such State * * * government that distributes such assistance and each such department or agency (and each other State * * * government entity) to which the assistance is extended, in the case of assistance to a State * * * government." 42 USC § 2000d-4a(1). The unemployment compensation program is a longstanding federal-state program; Oregon enacted its unemployment compensation law in 1935. *Puget Sound B. & D. Co. v. S. U. C. C.*, 168 Or 614, 620, 126 P2d 37 (1942).

The department, therefore, has an obligation to provide LEP individuals with access to its unemployment

---

[4] The March 2011 decision that claimant sought to challenge late had no such multi-language insert, as the administrative record reveals.

compensation program. The department recognizes that obligation, as evidenced by the department's LEP policy. The department's LEP policy states that federal laws, including Title VI and Executive Order 13166, 65 Fed Reg 50121 (Aug 11, 2000), were applied to the policy.

We thus do not view the department's LEP policy provision regarding "Customer Interaction" and its wording that "[d]epartment staff should make every attempt to determine whether a customer is in need of interpretive services" and "should contact a qualified bilingual staff member if available to assist" as merely precatory. Rather, we consider the department's rule that good cause for a late hearing request will exist when an LEP person has not been given language assistance in violation of the department's LEP policies in the context of the department's obligation under federal law to provide persons with limited English proficiency meaningful access to the unemployment insurance program. In that light, and given the LEP policy itself and ordinary meanings of the words "gain" and "knowledge" used within the rule, we conclude that the phrase "gaining knowledge that the person needed or was entitled to such [language] assistance" in OAR 471-040-0010(2) refers to the department's knowledge or awareness, obtained by any means, that the person needed or was entitled to oral or written language assistance. We remand for reconsideration under the correct understanding of OAR 471-040-0010(2).

Reversed and remanded.